Richardson, J.
dissenting. — It will be conceded, as unquestionable, that the President and Directors of the Bank of the Stale of South Carolina are officers of the State under the constitution.
This was settled in 1813, both by the House of Representatives and Senate; who, at that time, excluded lour of the then Directors from their Legislative seats, because they had become Directors of this State Bank.
They were held to be what is called in the constitution, Commissioners of the Treasury, or Treasurers of the State. That is, they held an office of trust, and were excluded, by the lsi. Art. 21 st. sec. of the constitution of South Carolina. This decision of the two houses has never been controverted. No Director has ever held a seat in the Legislature.
It follows, irresistibly, that the Act to establish the Bank is to be understood and expounded, precisely, as if the Act of incorporation had constituted the two State Treasurers and Comptroller, the President and Directors of the Bank. The President and Directors are, therefore, truly and identically, the constitutional Treasurers of the State.
It also follows, with the same force, that all the money, in any way discounted, loaned, or disposed of, by the corporation, is of the State’s money; and the debts due therefor, are to the State; and of course, all mortgages or other security to assure payment is given to the State. Any other disposition, or confiding of the Treasury of the State, but to such officers, would be evidently, unconstitutional. It is on this account that so much vigilance, and even personal responsibility, are required of the Directors, in lending money.
The State having resolved to make a corporate body its Treasurers, felt the necessity of great vigilance in controlling them. Experience had taught, and does teach all nations, that, at least, the riches of the State have wings; and its money apt to fly away. Hence, it is historically true, that nations, very generally, require a preference in payment, of debts due to the State, over other creditors of equal grade.
For instance, our own Act giving preference in cases of mortgages for all loans to the former Commissioners of the loan office, the administrators Act, and the Acts of Congress, ’97 and ’98, giving the like preference to the United States.
All prudent nations require the preference. — Because, men, the most astute in guarding their own domestic exchequer, are liberal and charitable in diffusing the public money.
*254 if the Act of 1812 had, in express terms, given all its powers to the State Treasurers and Comptroller, and they were the lenders of the State’s money, I do not question that the Act would be felt to be a necessary and great remedial law, to prevent the evil, and common inconvenience, just pointed out — which are found in the aptness, by which the public money is dispersed ; and the necessity of guarding against so common a danger.
In such a case the arguments ab-inconvenienti would have been felt, in all the force attached to them, in the construction of doubtful Acts, by all common law writers; and the counter argument of the increased inconvenience to second mortgagees, in their being obliged to inquire at the Bank offices, if the property offered had been already mortgaged, would have been considered too trifling to prevail against such a necessary guard of the public interest.
Public convenience and State necessity, in so important a matter, would have outweighed such minor objections.
In a word, then, if the Treasurers of the State had been the lenders of the public money, the arguments from inconvenience, as well as those from the spirit, end, and object, of the Act, would have been seen, as upholding the letter of the Act; and thereby, rendering the literal construction as unanswerable, as it is plain and unqualified, in its own language.
But what is the fact'? — -The President and Directors are the very constitutional Treasurers of the State. They constitute the financial department of the government, with all the official privileges of that department, to constitute, in the language of the constitution, “offices of trust” — I would say of high trust, and great moral and political power. They are Treasurers, with the power of lending the public money to whomsoever they deem fit.
I have sometimes heard this speculation on the character of the Bank : — That as the State cannot issue ‘ bills of credit] the bills of this Bank must be issued by a corporate body, for the State. This speculation assumes two palpable absurdities. 1. That the State has power to do, indirectly, what it cannot do, directly; i. e. — issue bills of credit by its Bank corporation — but this is too absurd for argument. 2. It assumes that bank bills are identical with “ bills of credit.” But bank bills are no more than promissory notes, and may not be taken as money. Whereas bills of credit must be taken in payment, as and for gold and silver coin. Like the old continental bills— such is the bill of credit, and what the Federal constitution prohibits every State from doing.
But every State can do, in this respect, what may be done by any individual citizen — issue its own notes for what they may be worth in the market, to buyers and borrowers who confide in such paper. This is the whole meaning of bank *255 bills. No one is obliged to take them in payment, like law-f«l coin, or “ bills of credit.”
We have only, then, in conclusion, to turn to themxpress enactment under a distinct section of this Act, to learn its literal meaning. But before citing this section, suffer me to remark, that the Bank Act of 1812 is extremely well drawn; each section constitutes a distinct head, or subject. For instance — the first section establishes the Bank, and contains 17 clauses, marked by figures relating to that head. The second section goes to a different head, to wit, how to ascertain the value of property mortgaged. The third section requires the inspection of the title of the borrower. And the fourth section gives the form of the mortgage.
Now it is evident to my understanding, that if the fifth section had been intended to refer only to such particular mortgages, it would have constituted a clause merely of this fourth section; or at least, have expressly referred to such particularly described mortgages. But instead of this, the fifth section is disjoined from all that go before it; and is in the following terms.
“ V- And be it further enacted by the authority aforesaid, That all mortgages taken for loans of money under this Act, shall be considered as being recorded from the date thereof, and shall have priority of any mortgages of the same property not previously recorded in the proper offices.”
How can we construe this section to be a mere clause; and to relate only to those particular mortgages ? Can words be plainer, or more comprehensive? “All mortgages for loans of money under this Act.” That is to say, for the public money lent in virtue of this Act. There is no expletive or relative, referring to any particular mortgages, whatever. Not a syllable referring to any antecedent. On the contrary, the most general terms are used, as if expressly to carry out the State policy, necessity, and convenience of a preference, as indispensable to the safety of the public Treasury.
Can we go by such terms of a plain general enactment, and confine this preference to the loan office exclusively ? This would be doing violence to the letter of the Act.
As to the spirit and general intendment of the Act — I would observe, that the many guards cautiously set forth in the Act — the revolution made in the financial system — all the public money and stock, past, present, and to come, and the extraordinary powers concentrated in these commissioners of the Treasury — all indicate the same guarded legislative aim, to defend the public exchequer, and give the State a preference, wherever its mortgagees first, although unrecorded. As to the intrinsic argument, the evidentiarei ; — the whole natural and rational right is in favor of the State j she being the/elder mortgagee.
*256 The complainants urge against such right, this technical ruje jaw. — tjlat tbefi- mortgage being first recorded, outweighs'the right of the State to its natural priority; — but the State rejoins, that the registry Acts do not apply to her mortgages; both by the express general provision of the Act of 1812, and the common public policy.
Which of these ought to prevail, under such an enactment? — is the question.
Its letter and terms admit of no dispute; and according to my understanding, the auxilliary arguments forcibly concur in the same construction. And I will add, that I know of no precedent to justify the Court in disregarding so plain and positive an enactment of the legislature.
I do not know, nor would I enquire, how much the State may lose by the present decision; which seems to my understanding, to pay too little regard to the letter of the Act, as well as to mistake its wise policy and object. And if the Act- be so construed, some remedial and explanatory Act ought to be immediately passed, under the rational policy of a State preference in all such cases. '
Nor can I conceive it necessary to rely upon any common construction of the Act; though I apprehend the practice to be in favor of the Bank.
Lastly, there may have been abuses, as some suppose, in using the powers of this great State corporation. If so, abuses ought to be corrected. But we are to do no injury to the public estate; which consists in the money placed in such bank hands ; and this estate is to be guarded now, as originally intended, as if the State, itself, acted at every step. It is not whether the Bank shall be constituted; but how this established institution shall be conducted for the best interest of the State, is now the question.
Assuredly, at least, we are not to curtail its legal advantages. But on the contrary to cherish it, by doing the best we can, according to the character of such settled estate. However great the public disappointment, in its practical character, revenue, or policy. How is this to be done ?
I answer. By returning — not precipitately — to the principle of the constitution ; i. e., at a fixed period; and thereafter, let the former Treasurers or Directors pass receipts, every four years, with.a new set of incoming Directors; which is what the constitution absolutely requires. This was clearly the intention of the Act of 1812, as proved by the early expulsion of Directors from legislative seats.
It is a fact, that the Comptroller was held to be reeligible without limitation. But, at last, it was seen he was a Commissioner of the Treasury; and accordingly, he was then restricted to the constitutional four years. In like manner, though late — let it be with the Bank Directors.
*257 Such a return to the constitution will carry, not only increased safety to the State’s Treasury ; but give satisfaction, in place of public discontent with the Bank; and go far to cure the suspicion oí favoritism, now so abounding in the general apprehension.
There is no safety for the discretionary disbursement of the public money, but in the actual counting and passing receipts, at regular periods, by new and incoming officers. In this consists the pracrical wisdom of the constitution, in regard to treasurers, sheriffs, &c.; and this principle is not to be changed, or eluded, by the invention of Bank corporations taking charge of the public Treasury.
But we have to return to the true principle, with due regard to old errors, as we did, not only in the Comptroller’s office, but in the late Court of Errors. The conservation of the constitution must be. But it is in the just, true and considerate spirit of such conservatism, to modify and restrain prevailing errors, so as finally to accomplish that end and object, without opposing with precipitation, inveterate popular misapprehension ; and the constitution then becomes clearer and stronger from past errors.
Returning alter this digression, to the proper construction of the Act. My argument is, that from the title of the Act ; i.e. — “ To establish a Bank on behalf of and for the benefit of the State.” — From its preamble — from its absorbing capital of money, stocks, and State revenues. Its various powers of lending money. The pledge of the faith of the State. Its power to own real and personal estate, and to sell the same. Its penalties on Directors, individually, for lending out money on illegal interest. And to borrow money on the credit of the State. From such provisions of this well considered Act, I can draw but one conclusion of its spirit, public character, and general intendment. Under such considerations and arguments, — to use technical terms — drawn ex rei termini, ab inconvenienti, etex visceribus actis, lam opinion that the motion should be granted, and the State have its preference, in this case, by reason of its first mortgage, unregistered, against the younger mortgage, though registered first.
1. Because the Act so makes the law, without the least qualification in its terms.
2. Because public necessity urges it.
3. Because prudence and good policy require such preference.
4. Because it is the accustomed law of governments to guard its Treasury by such preference.
All which arguments render the precent literal enactment, a wholesome, necessary, and satisfactory law, for the State of South Carolina.
Withers, J. absent holding Court in Charleston.